**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| **WHOOP, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **25-12690-FDS** |
| | ) | |
| **SHENZHEN LEXQI ELECTRONIC** | ) | |
| **TECHNOLOGY CO., LTD.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

**MEMORANDUM AND ORDER ON**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**SAYLOR, J.**

This is a trade-dress infringement case. Plaintiff Whoop, Inc., a United States corporation, alleges that defendant Shenzhen Lexqi Electronic Technology Co., Ltd., a Chinese corporation, manufactures and sells a health-monitoring device that infringes on its intellectual-property rights. It seeks monetary and injunctive relief under federal law and Mass. Gen. Laws ch. 93A. It has moved for a preliminary injunction barring defendant from selling its allegedly infringing products while this case continues.

For the reasons that follow, the motion will be granted.

## I.    Background

Whoop, Inc., is a U.S.-based technology company that produces the "WHOOP Wearable," a device that "allows consumers to track daily behaviors and metrics like sleep, strain, recovery, and more, to help users optimize their physical and mental performance." (Compl. ¶¶ 5, 22-24). Whoop released the first commercial version of the WHOOP Wearable in 2015. (*Id.* ¶ 25). Although the device has since gone through several iterations, all versions have

included the same "non-functional and distinctive trade dress," consisting of "a continuous fabric band that wraps over the device (i.e., a faceless device) with thin metal accents on the sides of the device." (*Id.* ¶ 26). According to the complaint, "[a]s a result of long and substantial use, sales, advertising, and third-party recognition," the design of the WHOOP Wearable has become strongly associated with Whoop, Inc. (*Id.* ¶¶ 32-46).

Shenzhen Lexqi Electronic Technology Co., Ltd., is a manufacturer of smart watches and health monitoring wearable devices with its offices in Shenzhen, China. (Compl. ¶¶ 6, 47).

In July 2025, Whoop became aware of several listings on Amazon.com selling what appeared to be knockoff versions of the WHOOP Wearable. (Compl. ¶ 48). When Whoop sent letters to the entities listing these products, they responded that they had purchased the devices from Shenzhen Lexqi, and that they had been authorized by Shenzhen Lexqi to sell the devices in the United States. (Compl. ¶¶ 54-55).

On August 7, 2025, Whoop sent a letter to Shenzhen Lexqi demanding that it cease and desist the sale and manufacture of its knockoff devices, which Whoop alleged infringed on its trade-dress rights. (Compl. ¶ 59). On August 19, 2025, it received a reply from Mandana Jafarinejad, a California-based attorney, who stated that she "represent[s] Shenzhen Lexqi . . . in regards to intellectual property claims." (Compl. ¶ 60; *id.*, Ex. J at 3). On August 21, 2025, attorney Jafarinejad sent a letter on Shenzhen Lexqi's behalf denying that its products infringed on any of Whoop's intellectual-property rights. (*Id.*, Ex. J at 4).

Plaintiff filed this action and moved for a preliminary injunction on September 22, 2025. The motion was accompanied by several declarations from its executives. (Dkt. No. 9, 10, 11, 12). After some litigation concerning service of process in China, counsel for defendant

2

eventually entered an appearance, and defendant filed an opposition to the motion on December 23, 2025.  (Dkt. No. 26).  The Court held a hearing in this matter on January 9, 2026.

## II.   <u>Legal Standard</u>

A preliminary injunction is an "extraordinary and drastic remedy" that "is never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quoting *Yakus v. United States*, 321 U.S. 414, 440 (1944)).  A plaintiff seeking a preliminary injunction must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction serves the public interest.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  A plaintiff's likelihood of success on the merits "weighs most heavily" in the court's determination; without it, the remaining factors "become matters of idle curiosity."  *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020) (citing *New Comm Wireless Servs. v. SprintCom Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)).  "[A]n inquiring court need not conclusively determine the merits of the movant's claim; it is enough for the court simply to evaluate the likelihood . . . that the movant ultimately will prevail on the merits."  *Id.* at 18.

## III.   <u>Analysis</u>

Although the complaint asserts several claims, including federal and state unfair-competition claims and a claim under Mass. Gen. Laws ch. 93A, plaintiff seeks a preliminary injunction only with regard to its federal trade-dress infringement claim under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  Therefore, the Court will only consider that claim in evaluating the preliminary-injunction factors.

### A.   <u>Likelihood of Success on the Merits</u>

A trade-dress claim is a species of trademark claim, and "[t]rade dress" is defined as "the design and appearance of a product together with the elements making up the overall image that

serves to identify the product presented to the consumer." *Yankee Candle Co. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 37-38 (1st Cir. 2001).

To succeed in a trade-dress infringement action, a party "must demonstrate both that its [trade dress] merits protection and that the allegedly infringing use is likely to result in consumer confusion." *Borinquen Biscuit Corp v. M.V. Trading Corp.*, 443 F.3d 112, 116 (1st Cir. 2006). Plaintiff has shown a likelihood of success as to both counts.

### 1.    Protectable Trade Dress

Plaintiff defines the WHOOP Trade Dress as "a continuous fabric band that wraps over the device (i.e., a faceless device) with thin metal accents on the side of the device."  (Decl. of Brett Tom ¶ 7, Dkt. No. 11).  To be protectable, plaintiff must show that the WHOOP Trade Dress is "used in commerce," "non-functional," and "distinctive," as each of those terms is used in trademark law.  *Birkenstock US BidCo, Inc. v. White Mountain Int'l LLC*, 747 F. Supp. 3d 292, 300 (D. Mass. 2024) (citing *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 35 (1st Cir. 1998)).

#### a.    Use in Commerce

Plaintiff asserts that the WHOOP Trade Dress has been used in commerce since at least 2015, and defendant does not appear to contest that assertion.  (*Id.* ¶ 11).  This requirement is therefore satisfied.

#### b.    Functionality

"[T]rademark and trade dress law . . . encourages production of products of high quality 'and simultaneously discourages those who hope to sell inferior products by capitalizing on a consumer's inability quickly to evaluate the quality of an item offered for sale.'" *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 36 (1st Cir. 1998) (quoting *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 164 (1995)).

"[T]rade dress protection may not be claimed for product features that are functional." *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001). "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *I.P. Lund*, 163 F.3d at 36 (quoting *Qualitex*, 514 U.S. at 164). In a trade dress infringement action where the trade dress at issue has not been registered with the U.S. Patent and Trademark Office, the party "assert[ing] trade dress protection has the burden of proving that the matter sought to be protected is not functional." 15 U.S.C. § 1125(a)(3).

In broad terms, a product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Qualitex*, 514 U.S. at 165 (quoting *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 850 n.10 (1982)). Stated otherwise, a feature is functional if "exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Id.* And even features which perform a "function" in the colloquial sense of that term can still sometimes be nonfunctional for trade dress purposes, such as when they are arranged in some particular arbitrary manner. *See* Restatement (Third) of Unfair Competition § 17 cmt. b (Am. L. Inst. 1995) ("A . . . product feature is not functional merely because the feature serves a utilitarian purpose. The recognition of trademark rights is precluded only when the particular design affords benefits that are not practically available through alternative designs."); *see also I.P. Lund*, 163 F.3d at 37; *Birkenstock US BidCo, Inc. v. White Mountain Int'l LLC*, 747 F. Supp. 3d 292, 302 (D. Mass. 2024) (recognizing that certain shoe elements, where "arranged in an arbitrary manner," could be nonfunctional). An often-cited list of factors to be considered in determining whether a feature is functional is "(1) the existence of a utility patent disclosing the utilitarian advantages of the design; (2) advertising materials in

which the originator of the design touts the design's utilitarian advantages; (3) the availability to competitors of functionally equivalent designs; and (4) facts indicating that the design results in a comparatively simple or cheap method of manufacturing the product." *CeramTec GmbH v. Coorstek Bioceramics LLC*, 124 F.4th 1358, 1363 (Fed. Cir. 2025) (quoting *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 1340-41 (C.C.P.A. 1982)).

Thus, for example, courts have recognized as functional the overall design of a dental implant, *Straumann Co. v. Lifecore Biomedical Inc.*, 278 F. Supp. 2d 130, 136 (D. Mass. 2003); the ribbed design on top of a hard hat, *Mine Safety Appliances Co. v. Electric Storage Battery Co.*, 405 F.2d 901, 903-04 (C.C.P.A. 1969); and the design of the body of an acoustic guitar, *In re Gibson Guitar Corp.*, 61 U.S.P.Q.2d 1948 (2001). Courts have recognized as nonfunctional, by contrast, the design of a maple syrup bottle, *Hillside Plastics, Inc. v. Dominion & Grimm U.S.A., Inc.*, 2018 WL 4537205, at *12 (D. Mass. Aug. 6, 2018); the "overall design" and certain components of a "stylus holder," *Genesis Strategies, Inc. v. Pitney Bowes, Inc.*, 50 F. Supp. 3d 59, 63-65 (D. Mass. 2014); and the overall shape of a Zippo lighter, *In re Zippo Mfg. Co.*, 50 U.S.P.Q.2d 1852 (1999).

The existence of a utility patent covering elements of the trade dress can be key to the functionality inquiry, because "[a] utility patent is strong evidence that the features therein claimed are functional." *TrafFix*, 532 U.S. at 29. *TrafFix* concerned a certain "dual-spring design" for temporary road signs that assisted them in staying upright in windy conditions. *Id.* at 25. The design was originally protected by a utility patent; after the patent expired, a competitor began selling a similar sign after "reverse engineer[ing]" the original design. *Id.* at 26. The original producer sued, claiming that the competitor's design infringed on its trade dress rights. *Id.* The Supreme Court held that the dual-spring design was not protectable trade dress because

6

it was functional.  *Id.* at 30-32.  In so holding, the Court placed "great weight" on the existence of an expired utility patent for the dual-spring design.  "If trade dress protection is sought for those features [claimed in a utility patent]," the Court stated, "the strong evidence of functionality based on the previous patent adds great weight to the statutory presumption that features are deemed functional until proved otherwise by the party seeking trade dress protection. Where the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device."  *Id.* at 29-30.

The Court made clear, however, that the presumption of functionality does not necessarily attach to every feature that has appeared in a utility patent.  As the Court explained:

> In a case where a manufacturer seeks to protect arbitrary, incidental, or ornamental aspects of features of a product found in the patent claims, such as arbitrary curves in the legs or an ornamental pattern painted on the springs, a different result might obtain. There the manufacturer could perhaps prove that those aspects do not serve a purpose within the terms of the utility patent. The inquiry into whether such features, asserted to be trade dress, are functional by reason of their inclusion in the claims of an expired utility patent could be aided by going beyond the claims and examining the patent and its prosecution history to see if the feature in question is shown as a useful part of the invention.

*Id.* at 34.

Therefore, a party claiming trade-dress protection for a feature that appears in a utility patent can show that the presumption of functionality should not apply by demonstrating that the feature in question is not in fact a "useful part of the invention."  *See id.*

Applying those standards, plaintiff has shown that it is likely to succeed in demonstrating that the WHOOP Trade Dress is nonfunctional.

First, the *Morton-Norwich* factors (apart from the "existence of a utility patent," discussed in greater detail below) support a finding of nonfunctionality.  As to "advertising materials in which the originator of the design touts the design's utilitarian advantages," plaintiff has provided its advertising materials and has shown that it relies on "highlighting the recognizable, unique form factor" of its devices in its advertising, not on the "utilitarian advantages" of the design.  (Decl. of John Sullivan ¶ 13, Dkt. No. 12).  Some materials focus on the "faceless" nature of the device, but plaintiff does not claim that its trade dress encompasses all faceless fitness trackers; it claims only those with "a continuous fabric band that wraps entirely over the device . . . with thin metal accents on the sides of the device."  (Br. Supp. Prelim. Inj. 2; Decl. of Brett Tom ¶ 7).

Second, "functionally equivalent designs" are available to competitors:  plaintiff provide several examples of faceless fitness trackers that clearly do not employ the WHOOP Trade Dress.  (Supp. Decl. of Brett Tom ¶¶ 33-42).

Finally, there are no facts suggesting that the WHOOP Trade Dress "results in a comparatively simple or cheap method of manufacturing the product"; in fact, defendant suggests that a device embodying the WHOOP Trade Dress would be more complicated to manufacture than its devices.  (Resp. 13 ("[Defendant] has eschewed use of a complex tri-fold clasp . . . and employed a simple design that features a band that passes through a slot formed on

the top of the sensor.")).  These factors, therefore, tend to demonstrate that the WHOOP Trade

Dress does not "affect[] the cost or quality of the article."  *Qualitex*, 514 U.S. at 165.

Defendant's argument to the contrary, which is based entirely on its inclusion in an earlier

utility patent, is unavailing.  As defendant correctly notes, much of what constitutes the WHOOP

Trade Dress is included in the claims of plaintiff's earlier utility patent, U.S. Patent No.

12,295,746.  The '746 patent includes among its claims a "clasp includ[ing] a pair of arms

extending from the first end of the clasp to the second end of the clasp," which form the "thin

metal accents on the sides of the device" when the clasp is closed.  '746 Patent col. 70 l. 43-44.

The patent also includes among its claims "a band of an elastic material" meeting several

physical criteria, which constitutes the "continuous fabric band that wraps entirely over the

device."  '746 Patent col. 70-71.  Based on the inclusion of those features in the '746 patent,

defendant argues, the presumption of functionality from *TrafFix* should apply.

Defendant's argument reads *TrafFix* too broadly.  To be sure, the Supreme Court stated

that "[a] prior patent . . . has vital significance in resolving the trade dress claim."  *TrafFix*, 532

U.S. at 29.  But in *TrafFix*, the "central advance claimed" in the patent—the "dual-spring

design"—was "an essential feature" of the trade dress for which protection was sought.  *Id.* at 30.

Here, by contrast, the "central advance claimed" in the '746 patent is the "C-shaped buckle" on

the adjustable strap for a WHOOP device, not the design of the entire device itself.  (Pl.'s Reply

Br. 2-3).

Instead, this case appears to fall within the exception recognized by the *TrafFix* Court—

where "a manufacturer seeks to protect arbitrary, incidental, or ornamental aspects of features of

a product found in the patent claims."  *TrafFix*, 532 U.S. at 34.  While certain aspects of the

WHOOP Trade Dress do appear within the claims of the '746 patent, they are not the "central

advance claimed"—they are merely "ornamental aspects" of the design included in order to give

full context to the claimed advancement.  Another feature that forms part of the same claim is "a

band of an elastic material, the band having a first end and a second end," but that clearly is not

the "central advance" of the patent, nor would it preclude any future trade-dress claims based on

a particular design of an elastic band.  '746 Patent col. 70.  Therefore, although aspects of the

WHOOP Trade Dress may fall within the claims of the '746 patent, they are merely "ornamental

aspects of features of a product found in the patent claims," and the presumption of functionality

from *TrafFix* does not attach.  *TrafFix*, 532 U.S. at 34.

Finally, unlike in *TrafFix*, this case involves an unexpired patent, and yet neither party

appears to contend that plaintiff's claim against defendant should have (or even could have) been

brought as a claim for patent infringement.  It would be strange to conclude that plaintiff has

limited its legal rights as to the features claimed as part of the WHOOP Trade Dress by filing for

and obtaining a utility patent for a certain feature of the device.[1]

In any event, at this stage of litigation plaintiff need not show conclusively that it will

succeed in proving that the WHOOP Trade Dress is nonfunctional; it need only show that it will

likely do so.  It has met that burden here.

### c.    Distinctiveness

Finally, trade dress must be "distinctive" to be protected under the Lanham Act.  To

prevail on a trade dress claim based on a product's design, rather than its packaging, a plaintiff

---

[1] In addition, the fact that certain aspects of the WHOOP Trade Dress —including the "thin metal accents" that form part of the buckle that closes the band, as well as the faceless design of the product—serve some "function" in the colloquial sense of that term is ultimately irrelevant to answering whether the WHOOP Trade Dress as a whole is "functional."  As recognized earlier, the fact that "[a] feature serves a utilitarian purpose" does not necessarily mean that feature is "functional" and therefore ineligible for trade-dress protection.  *See* Restatement (Third) of Unfair Competition § 17 cmt. b (Am. L. Inst. 1995).

must show that the trade dress has acquired "secondary meaning, which occurs when, 'in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself.'" *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000) (quoting *Inwood Lab'ys*, 456 U.S. at 851 n.11 (citation modified)).  In other words, a product's design can never be "inherently distinctive," as can certain word marks and product-packaging trade dress, because "even the most unusual of product designs . . . is intended not to identify the source, but to render the product itself more useful or more appealing." *Id.* at 212-14.

Secondary meaning can be shown in several ways.  A plaintiff can introduce "direct evidence probative of secondary meaning," which takes the form of "consumer surveys and testimony by individual consumers" that tends to show that the trade dress functions as a source identifier. *Yankee Candle*, 259 F.3d at 43.  Plaintiff has introduced no such evidence here.

Alternatively, a plaintiff can prove secondary meaning based on circumstantial evidence, including "[1] the length and manner of the use of the trade dress, [2] the nature and extent of advertising and promotion of the trade dress, . . . [3] the efforts made to promote a conscious connection by the public between the trade dress and the product's source[,] . . . [4] the product's 'established place in the market'[,] and [5] proof of intentional copying." *Id.* at 43-44; *see also Flynn v. AK Peters, Ltd.*, 377 F.3d 13, 20 (1st Cir. 2004) (recognizing first three factors only).  It is well-established that "[p]roof of secondary meaning entails vigorous evidentiary requirements." *Yankee Candle*, 259 F.3d at 43 (quoting *Boston Beer Co. Ltd. P'ship v. Slesar Bros. Brewing Co., Inc.*, 9 F.3d 175, 181 (1st Cir. 1993)) (alteration in original).

Beginning with the first factor, the length and manner of the use of the trade dress weighs in plaintiff's favor.  The WHOOP Trade Dress has been employed by plaintiff for more than ten

years, and it has been central to plaintiff's entire business during that timeframe.  (Supp. Decl. of Brett Tom ¶ 4, Dkt. No. 28; Decl. of John Sullivan ¶¶ 5-7).

The second, third, and fourth factors—the "nature and extent of the advertising and promotion of the trade dress," "the efforts made to promote a conscious connection by the public between the trade dress and the product's source," and "the product's established place in the market"—are related, and each weighs in plaintiff's favor.  Plaintiff has provided evidence concerning the extensive advertising efforts it has undertaken, including through television commercials (at least one of which aired during the Super Bowl), social media, and celebrity endorsements.  (Decl. of John Sullivan ¶¶ 8-14).  Plaintiff has also provided news articles and social-media accounts identifying public figures wearing one of plaintiff's products based on visual identification of the WHOOP Trade Dress from a distance.  (*Id.* ¶¶ 15-19).

Defendant offers two principal counterarguments.  First, defendant contends that "any potential consumer recognition" identified by plaintiff "is the result of the WHOOP brand name and not . . . the alleged trade dress."  (Resp. Opp'n Pl.'s Mot. Prelim. Inj. ("Resp.") 11, Dkt. No. 26).  But plaintiff convincingly shows that the name "Whoop" or its "W" logo appear only faintly on most embodiments of its trade dress, so that it is substantially more likely that consumer recognition is driven by the trade dress itself and not any branding on the device.  (Supp. Decl. of Brett Tom ¶¶ 20-21).[2]

Second, defendant contends that "WHOOP's own admission that the wearable fitness market is crowded with similar products . . . undermines its claim of distinctiveness."  (Resp. 13).  But the two devices defendant points to as examples of "similar products"—the "Pavlok 2"

---

[2] For example, plaintiff has submitted a news article featuring a photograph of Prince William wearing one of its devices.  The photograph is taken from such a distance that no lettering or other markings are visible on the device.  (Decl. of John Sullivan ¶ 16; *id.* Ex. 4, Dkt. No. 12-4).

and the "Caeden Sona"—are visually distinct from the WHOOP Trade Dress, and one of them was apparently discontinued after only about a year on the market.  (Supp. Decl. of Brett Tom ¶¶ 34-37).  Under the circumstances, the existence of such devices does not undercut plaintiff's claim of distinctiveness—particularly where "several . . . courts of appeals . . . have found" as little as "five years' substantially exclusive and continuous use to weigh strongly in favor of a finding of secondary meaning." *Converse, Inc. v. International Trade Comm'n*, 909 F.3d 1110, 1121 (Fed. Cir. 2018).

For those reasons, plaintiff is likely to show that its trade dress is used in commerce, is nonfunctional, and is distinctive.  Therefore, plaintiff is likely to show that its trade dress is eligible for protection under the Lanham Act.

### 2.    Likelihood of Confusion

To prevail on its trade-dress infringement claim, plaintiff must also show that "prospective buyers of the product in question"—here, wearable fitness trackers—"are likely to be confused as to the product's source." *I.P. Lund*, 163 F.3d at 43.  And the "allegedly infringing conduct must create 'a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.'" *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 12 (1st Cir. 2008) (quoting *International Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200 (1st Cir. 1996)).  The First Circuit has identified eight factors to be weighed in determining whether consumers are likely to be so confused:

> (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark. . . . No one factor is necessarily determinative, but each must be considered.

*I.P. Lund*, 163 F.3d at 43 (quoting *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 29 (1st Cir. 1989).

Starting with the similarity of the marks and goods, defendant's allegedly infringing device is almost identical to plaintiff's device that embodies the WHOOP Trade Dress. The side-by-side comparison provided in plaintiff's motion demonstrates this clearly:

| Representative Example of WHOOP Product Featuring the WHOOP Trade Dress | Representative Example of Shenzhen Lexqi's Infringing Wearable |
|---|---|
|  | |

(Br. Supp. Pl.'s Mot. Prelim. Inj. 4).

There are some minor differences between the two: the metal portion of plaintiff's device is thicker than that of defendant's device, and defendant's device includes a different buckle mechanism, as defendant notes. (Resp. 13-14). But the similarities are unmistakable, and, particularly from a distance, the two devices are virtually indistinguishable. And the two devices represent themselves as the same good: wearable fitness trackers.

The next three factors—"the relationship between the parties' channels of trade," "the relationship between the parties' advertising," and "the classes of prospective purchasers"—are somewhat mixed, but largely favor plaintiff. Both parties offer their products for sale on Amazon.com, showing that they utilize the same channels of trade. (Decl. of Brett Tom ¶¶ 29-30). But, as defendant notes, the "classes of prospective purchasers" may well differ because plaintiff's devices are sold at a higher price point than defendant's and require a monthly

subscription to function.  (Resp. 14; *see generally* Decl. of John Hendershott, Ex. 3, Dkt. No. 14-3 (defendant's devices listed on Amazon.com for between $80 and $170)).  And "the relationship between the parties' advertising" depends on how one defines "advertising."  Plaintiff engages in extensive advertising of its product; there is no evidence that defendant engages in any advertising.  (Decl. of John Sullivan ¶¶ 7-12).  But the images on the Amazon listings for defendant's product—to the extent those can be considered "advertising"—are very similar to plaintiff's advertisements.  (*See, e.g.*, Decl. of John Hendershott, Ex. 3 at 3-5).  In sum, then, these three factors tilt somewhat, but not overwhelmingly, in plaintiff's favor.

As for "evidence of actual confusion," plaintiff provides some limited evidence suggesting that consumers have been confused about the source of defendant's products.  Plaintiff provides a review on Amazon.com for one of defendant's products with the title "Whoop band," suggesting that the consumer who left the review may have erroneously believed that the product was in fact made by plaintiff.  (Decl. of John Hendershott, Ex. 3 at 9).  Defendant suggests that this reviewer may have intended to compare defendant's device to plaintiff "as being a cheaper subscription-less alternative," but there is no evidence to that effect.

(Resp. 14).  Because plaintiff has only provided this one review as evidence of consumer

confusion,[3] this factor is somewhat ambiguous but weighs slightly in plaintiff's favor.[4]

As for "the defendant's intent in adopting its mark," plaintiff has provided no evidence.

In its brief, plaintiff asserts that "[u]pon information and belief, [defendant] intentionally copied

the WHOOP Trade Dress in order to gain an unfair commercial advantage by mimicking

[plaintiff] to confuse consumers and to trade on the goodwill of the iconic WHOOP Trade Dress

that [plaintiff] has cultivated over the past decade."  (Br. Supp. Prelim. Inj. 16).  But it is well-

established that "[t]o carry its burden, a plaintiff seeking a preliminary injunction must offer

proof beyond unverified allegations in the pleadings."  *Straham v. Roughead*, 2010 WL 4827880,

at *10 (D. Mass. Nov. 22, 2010) (quoting *Palmer v. Braun*, 155 F. Supp. 2d 1327, 1331 (M.D.

Fla. 2001)).  And although plaintiff contends that defendant has been on notice of its alleged

infringement since July 2025, "mere knowledge of the existence of a competitor's mark is

insufficient to prove bad faith."  *Public Impact, LLC v. Boston Consulting Grp., Inc.*, 169 F.

Supp. 3d 278, 292 (D. Mass. 2016) (quoting *NEC Elecs., Inc. v. New England Circuit Sales, Inc.*,

722 F. Supp. 861, 866 (D. Mass. 1989)) (citation modified).  Plaintiff's allegations, made on

---

[3] Plaintiff also provides some evidence that one of the Amazon storefronts offering defendant's products was confused about the source of the products, but it is unclear whether such evidence is relevant to the infringement issue.  After contacting one of the storefronts offering defendant's products, plaintiff received a reply stating that the storefront had erroneously listed the product without "your"—i.e., plaintiff's—"approval," and that "[a]ll products from your brand have been removed from our inventory to ensure full compliance with your directives."  (Decl. of John Hendershott, Ex. 27 at 2, Dkt. No. 14-27).  This strongly suggests that the storefront was confused about the source of defendant's product and erroneously thought that it in fact came from plaintiff.  But it is unclear whether this evidence is relevant, considering that the purpose of trademark law is to "protect[] the public by making consumers confident that they can identify brands they prefer and can purchase those brands without being confused or misled"—not to protect other participants in the commercial marketplace, such as retailers and resellers, from confusion.  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 784 n.19 (1992) (Stevens, J., concurring in the judgment) (quoting S. Rep. No. 100-515, at 4 (1988)).  Because it is unclear whether evidence of retailer confusion is relevant to the question of *consumer* confusion, the Court will not consider this evidence in weighing the "actual confusion" factor.

[4] Although this factor is important, "proof of actual confusion is not essential to finding likelihood of confusion."  *Public Impact, LLC v. Boston Consulting Grp., Inc.*, 169 F. Supp. 3d 278, 291 (D. Mass. 2016) (quoting *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 120 (1st Cir. 2006).

information and belief, are insufficient at this stage to make out a showing of bad faith, and this factor therefore favors defendant.

Finally, "the strength of the plaintiff's mark" favors plaintiff.  In evaluating the strength of a mark, courts look to "the length of time the mark has been used, its renown in the plaintiff's field of business, and the plaintiff's actions to promote the mark."  *Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8, 19 (1st Cir. 2004) (quoting *Star Fin. Servs. v. Aastar Mortg. Corp.*, 89 F.3d 5, 11 (1st Cir. 1996)).  All of those factors strongly favor plaintiff.  Plaintiff has used the WHOOP Trade Dress continuously for more than ten years.  (Supp. Decl. of Brett Tom ¶ 4).  It has shown some evidence of renown through both industry publications and wider media coverage.  (Decl. of Brett Tom ¶¶ 15-16; Decl. of John Sullivan ¶ 15).  And it has provided evidence of its extensive efforts to promote the WHOOP Trade Dress through advertising.  (Decl. of John Sullivan ¶¶ 8-13).  This factor thus strongly favors plaintiff.

In sum, three factors—"the similarity of the marks," "the similarity of the goods," and "the strength of the plaintiff's mark"—strongly favor plaintiff, and the First Circuit has noted that "where the parties are direct competitors, the most important factor in the [likelihood-of-confusion] analysis is the similarity-of-marks inquiry."  *Boston Duck Tours*, 531 F.3d at 26.  Four more factors—"the relationship between the parties' channels of trade," "the relationship between the parties' advertising," "the classes of prospective purchasers," and "evidence of actual confusion"—tilt somewhat, but not overwhelmingly, in plaintiff's favor.  Only one factor—"the defendant's intent in adopting its mark"—favors defendant.  Under the circumstances, plaintiff has established it is likely to succeed in showing a likelihood of consumer confusion.

For the foregoing reasons, plaintiff has shown that it is likely to succeed on the merits of its trademark infringement claim, because it is likely to show both that the WHOOP Trade Dress is protectable and that defendant has infringed on that trade dress.

### B.    Immediate Threat of Irreparable Harm

Irreparable harm is measured "on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that [t]he strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." *Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010) (internal quotations and citations omitted). And "[b]ecause adequate legal remedies foreclose injunctive relief, [a plaintiff] cannot demonstrate irreparable harm without showing that they have inadequate remedies at law." *Together Emps. v. Mass Gen. Brigham Inc.*, 19 F.4th 1, 7-8 (1st Cir. 2021).

Section 1116(a) of Title 15 provides that "[a] plaintiff seeking" an injunction to prevent a violation of section 43(a) of the Lanham Act "shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits . . . in the case of a motion for a preliminary injunction." 15 U.S.C. § 1116(a).

Defendant attempts to rebut this presumption by arguing that plaintiff waited too long to bring suit, and that its delay undercuts any claim to irreparable harm. *See Voice of the Arab World, Inc. v. MDTV Medical News Now, Inc.*, 645 F.3d 26, 35 (1st Cir. 2011) ("[A]ny presumption of irreparable harm that may arise upon a finding of likelihood of success on the merits of a trademark infringement claim is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief." (internal quotation marks omitted)). That argument fails for two reasons.

First, the cases defendant cites addressed the issue of whether an earlier, judge-made presumption of irreparable harm should apply under the circumstances. However, those cases

have been superseded by the Trademark Modernization Act of 2020, codified at 15 U.S.C.

§ 1116(a), which states unconditionally that "[a] plaintiff seeking [an injunction under § 43(a)]

*shall be entitled* to a rebuttable presumption of irreparable harm" provided certain conditions are

met.  *See* Trademark Modernization Act of 2020 § 226, Pub. L. No. 116-260, 134 Stat. 2200.

Second, defendant claims that its devices have been marketed and sold through Amazon

only since January 2025; therefore, even if plaintiff had learned about the potential infringement

as soon as the sales began, it would have waited only seven months to send cease-and-desists

letters and eight months to file suit—hardly comparable to the nine years of acquiescence in

*Voice of the Arab World*.  645 F.3d at 36.

Therefore, because defendant has not successfully rebutted the presumption of irreparable

harm, plaintiff has satisfied this second factor.[5]

## C.    <u>Balance of Equities</u>

The balance of equities also favors plaintiff.  In weighing the balance of equities, "it is

generally true that the harm to the defendant flowing from an injunction where infringement

appears likely is entitled to less consideration than other harms.  The Court is to consider the

potential legitimate harm to the defendants owing to the injunction as balanced against the

degree of plaintiff's likelihood of success on the merits."  *Public Impact*, 169 F. Supp. 3d at 296

(quoting *Friz v. Arthur D. Little, Inc.*, 944 F. Supp. 95, 97-98 (D. Mass. 1996)).  Plaintiff has

invested substantial time and resources over a decade into developing products that employed the

WHOOP Trade Dress.  (Br. Supp. Prelim. Inj. 19).  And although defendant has identified some

harms that would flow from the issuance of a preliminary injunction, including the potential

---

[5] Even if the Court did not apply this presumption, plaintiff has still successfully shown irreparable harm based on injuries to its goodwill and reputation as a result of defendant's infringement, injuries that are "not easily measured or fully compensable in damages."  *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18-19 (1st Cir. 1996).

destruction of some of its inventory held by Amazon, the Court finds that the demonstrated harms to plaintiff, when considered along with plaintiff's strong showing of likelihood of success on the merits, outweigh any such harms to defendant.

### D. Public Interest

Finally, the public interest weighs in plaintiff's favor. Courts have recognized that the "public interest favors protecting against further violation of federal . . . trademark laws." *Lifted Rsch. Grp., Inc. v. Behdad, Inc.*, 591 F. Supp. 2d 3, 8 (D.D.C. 2008); *see Commerce Bank & Trust Co. v. TD Banknorth, Inc.*, 554 F. Supp. 2d 77, 88 (D. Mass. 2008) ("In trademark cases, the public interest almost always favors the granting of otherwise appropriate injunctions." (internal quotation omitted)). Therefore, this favor favors plaintiff as well.

### E. Injunction Bond

Under Federal Rule of Civil Procedure 65(c), a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Defendant has not provided specific dollar figures for the harms it alleges it will endure if a preliminary injunction is issued. Based on a rough estimate of the cost of defendant's product to consumers, the apparent scale of defendant's manufacturing, and the potential legal costs imposed by a wrongly issued injunction, the Court finds that an injunction bond of $200,000 is "proper" under the circumstances and will require plaintiff to post a bond in that amount before the preliminary injunction comes into effect.

## IV. Conclusion

For the foregoing reasons, plaintiff's motion for a preliminary injunction is GRANTED. The Court will enter a separate preliminary injunction order.

**So Ordered.**

/s/  F. Dennis Saylor IV
F. Dennis Saylor IV
United States District Judge

Dated:  February 2, 2026